**POCAHONTAS COMMUNITY SCHOOL DISTRICT, Plaintiff-Appellee,**

v.

**Alice LEVENE, Defendant-Appellant.**

**No. 86–386.**

Court of Appeals of Iowa.

May 28, 1987.

---

**3.** The child was born April 13, 1980. The alleged incident happened January 19, 1985. She testified on January 6, 1986.

James L. Sayre of Sayre & Gribble, P.C., Des Moines, for defendant-appellant.

Derrick R. Franck of Franck, Mundt, Nepper & Franck, Denison, for plaintiff-appellee.

Heard by OXBERGER, C.J., and DONIELSON and SNELL, JJ.

SNELL, Judge.

Alice Levene was a sixth-grade teacher employed by Pocahontas Community School District whose contract was terminated. She had taught there for seventeen years. Pursuant to notice and recommendation by the superintendent, the school board of directors voted to terminate her continuing contract of employment, effective at the conclusion of the 1984–85 school year.

■ The board's decision was appealed to an adjudicator who reversed. That decision was appealed to the district court, which reversed the adjudicator's decision and affirmed the board's decision. The appeal to this court seeks reversal of the district court and school board and a reinstatement of Levene's teaching contract. Section 279.18 provides for appellate review of the district court's decision on judicial review. Our review is limited to the correction of errors under the seven standards set forth in section 279.18. *Board of Education of Fort Madison Community School District v. Youel*, 282 N.W.2d 677, 680 (Iowa 1979). If our conclusion is the same as that of the district court, we affirm; if it is not, reversal may be in order. *Fay v. Board of Directors of North-Linn Community School District*, 298 N.W.2d 345, 347 (Iowa App.1980). The superintendent has the burden of proving the existence of just cause to justify terminating a teacher's contract. *Munger v. Jesup Community School District*, 325 N.W.2d 377, 379 (Iowa 1982). We determine if the board's action is supported by a preponderance of the evidence in the record when that record is viewed as a whole. *Wedergren v. Board of Directors*, 307 N.W.2d 12, 20 (Iowa 1981); *Smith v. Board of Education of Fort Madison Community School District*, 293 N.W.2d 221, 223 (Iowa 1980); *see* Iowa Code § 279.18(6) (1987). In this case, we review all the evidence before the board to determine if by a preponderance its decision is supported. If it is, the adjudicator's decision is necessarily not. *See Board of Directors of Sioux City Community School District v. Mroz*, 295 N.W.2d 447, 448–49 (Iowa 1980). More-

over, the adjudicator may not substitute his judgment for that of the school board.

The adjudicator has no authority to decide which is the wiser policy. Iowa law leaves educational policy to school boards. On the other hand, this discretion is not a blank check to override the legitimate interests of teachers in job security. Accordingly, the test for the adjudicator is whether this policy choice is characterized by an abuse of discretion, was a clearly unwarranted exercise of discretion, or otherwise was arbitrary and capricious.

*Olds v. Board of Education of Nashua Community School District*, 334 N.W.2d 765, 772 (Iowa App.1983).

The reason assigned by the board for the termination of Levene's contract was "budgetary considerations, declining enrollment, and the need to make the most efficient utilization of staff have led to the need to eliminate an elementary teaching position. You have the least seniority of the elementary teachers of equal skill, ability, competence, and qualifications."

Appellant Levene claims a showing of "just cause" was not made, citing the following evidence. The lack of money argument is premised on a deficiency of $16,780.00 against an existing cash balance, if the teacher reduction is not made. However, out of an unspent carryover balance into the 1985–86 school year of $348,000.00, $190,000.00 was already in the hands of the district. Thus, a "need" to cut was not established.

The declining enrollment concern prompted the superintendent to decide to eliminate one third-grade teacher. The displaced third-grade teacher would teach sixth grade in Levene's stead. The adjudicator found that the next year's third grade projected enrollment would be only one student less, a drop of only 4.5%. He found this small difference made it impossible to accept the superintendent's argument of need. Finally, the superintendent said the termination of a teacher was needed to make the most efficient utilization of staff.

The third grade consisted of twenty-two students for the 1984–85 year and was taught by two teachers. The 1985–86 class of twenty-one students would be taught by one teacher. Levene argues that need is again unsubstantiated by the financial or enrollment figures. In fact, with a large kindergarten class of forty, the total enrollment through sixth grade for the 1985–86 school year may increase by eleven students. Moreover, Levene suggests that if twenty-one students can be effectively taught by one teacher and that is the only test, then any existing teacher at Pocahontas could be eliminated.

The financial stricture cited by the school board comes from an enrollment decline of 33.1% in the ten-year period 1975 to 1985. In 1975, there were 757 students in the district; in 1985, only 506. In the 1988–89 school year, enrollments are expected to be as low as from 440 to 461 pupils. Loss of pupils affects the district's financial ability since each student represented $2,424.00 to the school district in 1984. In addition, the school district had obligated itself to pay $61,091.00 in salary increases for the 1985–86 year pursuant to the collective bargaining process. Under the state foundation aid formula, the district would receive only $23,133.00 in "new money," leaving it $38,058.00 short for salary payments. In addition, more money will have to be paid for increases in non-salary items such as health insurance.

The cash on hand at the end of the school year was $102,196.00, less than one-third of the district's unused spending authority. If the financial picture is viewed on an accrual basis, a more serious financial picture emerges. Adding $95,920.00 of unreceived state funds to its cash on hand would give the school district $198,116.00 at the end of the year. Accrued payroll, employment taxes, and other bills payable in June but not paid until July equal $206,007.00. The school district's financial position on an accrual basis was $7,891.00 in the red.

In addition to the monetary considerations affected by the enrollment drop, the small classes result in reduced efficiency. Shortly before the superintendent's recommendation to reduce staff, the state depart-

ment of public instruction warned the district of the problems of low elementary enrollments. With no staff reduction in the third grade, one teacher would have eleven students, the other teacher ten. The unrebutted professional opinion of both the superintendent and principal was that a class of twenty-one third graders may easily be taught by one teacher. The school board also refutes Levene's claim that forty kindergarten children will move on to first grade, substantially increasing the total elementary enrollment since only nineteen sixth graders will go on to seventh grade. Pocahontas, however, has a Catholic elementary school which does not operate a kindergarten. A number of the forty kindergartners will attend first grade at the Catholic school instead of at the public school.

■ In *Von Krog v. Board of Education of Beaman-Conrad-Liscomb Community School District*, 298 N.W.2d 339 (Iowa App.1980), a reduction of staff based on evidence that the salary increases spent five-sixths of the expected new money was sufficient evidence of financial necessity. *Id.* at 341–42. It is also clear that a lack of need for services alone is just cause for terminating a teacher's contract. *Olds v. Board of Education of Nashua Community School District*, 334 N.W.2d 765, 771 (Iowa App.1983). "Just cause" includes budgetary and personnel requirements of a school district. *Briggs v. Board of Directors of Hinton Community School District*, 282 N.W.2d 740, 742 (Iowa 1979); *see Hagarty v. Dysart-Geneseo Community School District*, 282 N.W.2d 92 (Iowa 1979).

■ Our review convinces us that the school board met its burden of proof of showing just cause for terminating Levene's contract by a preponderance of the evidence. The "just cause" was budgetary problems, declining enrollment, and the need for efficient utilization of staff by reducing the third-grade teaching staff by one. We thus affirm the district court on these issues.

Another challenge is made to the board's action in claiming the staff reduction provision of the collective bargaining agreement was not followed. Article 3 of that agreement provides:

■ B. *Reduction in Staff Procedures*

When, in the judgment of the Board of Education, decline in enrollment, reduction of program or any other reason requires reduction in staff among teachers, the Administration shall attempt to accomplish same by non-replacement of staff turnover. In event necessary reduction in staff cannot be adequately accomplished by non-replacement of staff turnover given the necessity to hire and/or maintain the most competent and qualified staff available in the interest of perpetuating the highest quality education program possible, the Administration shall base its decision as to the resulting contract renewals on the relative skill, ability, competence and qualifications of available teachers to do the available work. If a choice must be made between two or more teachers of equal skill, ability, competence and qualifications to do the available work, contract renewals will be given to the teacher(s) with the greater full-time continuous length of service in the district.

It is understood that in determining the available teachers to do the available work consideration shall be limited to administrative units and departments. The administrative units shall be K–6, 7–8, and 9–12. Within the administrative units the teachers shall be considered within academic departments, if any, such as math, science, social studies, etc. If a teacher teaches in more than one department or has extra duty assignments, these additional assignments shall be considered as part of that teacher's skill, ability, competence and qualifications.

Levene claims the superintendent wrongly segregated five teachers from the staff reduction process, all of whom have less seniority than she does. These teachers were Nancy Clark, a special education teacher; Janet Johnson, an art teacher; Catherine Hoag, a learning disabilities teacher; Arlene DeWall, a chapter I read-

ing teacher; and Karen O'Neall, a music teacher. She alleges this cannot be legally done under the collective bargaining agreement because the only units specified are K–6, 7–8, and 9–12.

The board answers that the segregation from consideration of these five teachers is authorized by the collective bargaining agreement. Under that agreement, the categories to be scrutinized in judging which teachers are preferred is limited to administrative units and departments. Administrative units are defined as K–6, 7–8, and 9–12. The departments are defined to be academic departments within the administrative units. Examples are specifically cited in the collective bargaining agreement to be: math, science, social studies, etc. The agreement further dictates that "if a teacher teaches in more than one department or has extra duty assignments, these additional assignments shall be considered as part of that teacher's skill, ability, competence and qualifications."

The school board considered the five teachers teaching special education, art, learning disabilities, chapter I reading, and music to be departments such as math, science, and social studies. As such, they required specialized skill, ability, competence, and qualifications. The teachers of those subjects were entitled to have their special qualifications categorically considered. This interpretation of the master contract by the school board was not only proper, it was mandated.

Levene, in arguing otherwise, reaches for help from *Ar-We-Va Community School District v. Long*, 292 N.W.2d 402 (Iowa 1980), and *Hagarty v. Dysart-Geneseo Community School District*, 282 N.W.2d 92 (Iowa 1979). In *Hagarty*, the word "qualified" was interpreted in the staff policy on recall rights to mean certification and a general endorsement for teaching in the elementary grades. *Hagarty*, 282 N.W.2d at 97. Support for this interpretation was found by the court from its belief the parties wanted liberal recall rights. *Id.* In *Ar-We-Va*, the court construed the word "qualifications" of available teachers to do the available work to

refer only to the certification to teach. *Ar-We-Va*, 292 N.W.2d at 405. Consequently, the plaintiffs in *Ar-We-Va* were entitled to be evaluated against teachers K–9. The distinguishing feature in *Ar-We-Va* from the case at bar, however, is clearly pointed out by the supreme court as follows:

We further note that the contract makes no reference to elementary or junior high school as separate evaluative categories, as could have been done, but refers generally to "available teachers for available work" ... had the parties wanted to limit the evaluations, they were certainly at liberty to do so.

*Ar-We-Va*, 292 N.W.2d at 405.

In addition to the limitation in the contract here considered, i.e., administrative units K–6, 7–8, 9–12, which Levene lifts up for our note, the further evaluative category of academic departments is specifically mentioned in the contract. Neither *Hagarty* nor *Ar-We-Va* contain limiting categories designated for consideration of teachers grouped therein for exercising teacher termination procedures. Thus, neither case supports appellant's argument. *See also Von Krog v. Board of Education of Beaman-Conrad-Liscomb Community School District*, 298 N.W.2d 339, 344 (Iowa App. 1980) for a comparison of the term "qualified" as used in these cases and as used in *Bishop v. Keystone Area Education Agency No. 1*, 275 N.W.2d 744, 750 (Iowa 1979).

A further claim is made that even within the department category Levene is as well qualified as the chapter I reading teacher, has more seniority, and should therefore have been retained. This argument is based on the fact that for the 1984–85 school year no special certification to teach chapter I reading was required. Also, by September 1, 1986, when endorsement 91 would be required to teach chapter I reading, Levene said she would have it, being only four hours short of the necessary twenty hours. The school board, nevertheless, found the present reading teacher, Arlene DeWall, was preferred because she had been employed by the district only three years less than Levene, already had the endorsement 91, and had the experience of teaching the subject for eleven years full-time and two years half-time.

These factors are clearly part of a teacher's skill, ability, competence, and qualifications to be judged in determining which teachers are entitled to a greater preference for retention.

Comparisons of the relative value of several teachers to the school district do not lend themselves well to any legal, mathematical, or scientific means of resolution. Courts should, therefore, be reluctant to act as super school boards by viewing each facet of a given teacher's skill, experience, or ability and weighing them against those other teachers. It is under circumstances such as these that the rationale of the rule, that we are to give weight to the findings of the board, becomes apparent.

*Smith v. Board of Education of Mediapolis School District,* 334 N.W.2d 150, 152–53 (Iowa 1983).

We find the evidence shows by a preponderance that the school board complied with the provisions of the master agreement between the school district and the teachers association and that there was no violation of its terms. The decision of the trial court is affirmed. Costs are taxed to appellant.

AFFIRMED.

DONIELSON, J., concurs.

OXBERGER, C.J., concurs in result only.